Jane DOE and Baby Doe, Plaintiffs,

v.

DIVISION OF YOUTH AND FAMILY SERVICES, Andrea Young, Cathee Chichester, Peggy McHale, Keith Weinberg, Mary Ann St. John, Capital Health System, Inc., Evelyn Potako, Joanne Dix, Betty Bennett, Marietta Cahill, Paul Loeb, M.D., and Stephen Moffitt, M.D., Defendants.

No. CIV 00–3205(GEB).

United States District Court, D. New Jersey.

June 25, 2001.

464

Cynthia M. Dennis, Women and AIDS Clinic, Rutgers University School of Law—Newark, Newark, NJ, Attorney for Plaintiffs, Jane Doe and Baby Doe.

Stephanie A. Brand, Deputy Attorney General, Office of the New Jersey Attorney General, Newark, NJ, Attorney for Defendants, Division of Youth and Family Services, Andrea Young, Cathee Chichester, Peggy McHale, Keith Weinberg, and Mary Ann St. John.

Yves C. Veenstra, Parker, McCay, & Criscuolo, PC, Marlton, NJ, Attorney for Defendants, Capital Health System, Inc., Evelyn Potako, Joanne Dix, Betty Bennett and Marietta Cahill.

Joseph Goldberg, Margolis Edelstein, Westmont, NJ, Attorney for Defendants, Stephen Moffitt, M.D.

## OPINION

BROWN, District Judge

This matter comes before the Court upon the motion to dismiss of the defendants Division of Youth and Family Services ("DYFS"), Andrea Young, Cathee Chichester, Peggy McHale, Keith Weinberg and Mary Ann St. John (collectively, the "State Defendants"); upon the motion for judgment on the pleadings of the defendants Capital Health System, Inc. ("Capital Health" or "Capital Health Systems"), Evelyn Potako, Joanne Dix, Betty Bennett and Marietta Cahill (collectively the "Capital Health Defendants"); upon the motion to dismiss of the defendant Stephen Moffitt, M.D.; and upon the motion of the plaintiffs for leave to file an amended complaint. The Court has jurisdiction over the plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a) and supplemental jurisdiction over the plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a). For the reasons discussed below, the defendants' motions to dismiss and for judgment on the pleadings are granted in part and denied in part, and the plaintiffs' motion for leave to amend the complaint is denied.

## I. BACKGROUND

### A. THE ALLEGATIONS OF THE COMPLAINT

The plaintiff, Jane Doe,[1] alleges in her complaint that in February 1998 she began prenatal treatment at the Health Start Prenatal Program at Capital Health System. *See* Complaint at ¶ 20. On February 9, 1998, Jane Doe signed a written consent to random urine screening for drugs and HIV testing of her blood. *See id.* at ¶¶ 21–22. At no time during her pregnancy did the plaintiff's urine test positive for drugs. *See id.* at ¶ 23.

The plaintiff alleges that at some point after February 1998, she decided to withdraw her consent to be tested for HIV,

---

1. The names of the two plaintiffs obviously are fictitious.

and further alleges that Capital Health personnel failed to record her withdrawal in her records. *See id.* at ¶¶ 24–25. Hospital staff periodically telephoned the plaintiff and asked her to submit to testing, which she refused. *See id.* at ¶¶ 26 and 28. The plaintiff alleges that notwithstanding her refusal to be tested for HIV, in July 1998 defendant "Betty Bennett caused Plaintiff Jane Doe's blood to be tested for HIV...." *Id.* at ¶ 35. Later, the plaintiff was advised that she tested positive for HIV. *See id.* at ¶ 36. The plaintiffs further allege that "[t]he AZT recommended protocol for HIV positive [pregnant] mothers include[s][one] AZT pill [five] times a day during pregnancy beginning in the [fourteenth] week, [administration of AZT] during labor and delivery, and [administration of AZT] to the newborn right after birth for [six] weeks." *Id.* at ¶ 40. The defendant Marietta Cahill prescribed AZT to Jane Doe to take during her pregnancy, which Doe began taking but later stopped because of adverse side effects. *See id.* at ¶¶ 39 and 41. At some point between July and October 1998, unnamed personnel at Capital Health contacted DYFS and advised DYFS personnel that the plaintiff tested positive for HIV, but were told by DYFS to call back after Baby Doe was born as the situation was not ripe for intervention by DYFS. *See id.* at ¶¶ 42–43.

On October 1, 1998, Jane Doe experienced labor pains and went to Capital Health, but was told to return home as she was not yet ready to deliver. *See id.* at ¶ 45. While at home, the plaintiff took Tylenol with codeine to ease her pain, but the pain persisted and the plaintiff returned to the hospital. *See id.* at ¶¶ 46–47. The plaintiff alleges that upon her return to the hospital, defendant Paul Loeb, M.D., "openly discussed her HIV status and the administering of AZT during labor and delivery in front of the plaintiff's family,

who prior to that time had been unaware of her HIV status". *See id.* at ¶¶ 48 and 58. The plaintiff refused AZT, Loeb notified the plaintiff that he would not participate in the delivery, and the plaintiff again was sent home. *See id.* at ¶¶ 49–50. However, before the plaintiff left the hospital, her water broke and she was admitted to the hospital. *See id.* at ¶ 51. The plaintiff alleges that she repeatedly asked for pain medication, but refused intravenous medication, and was denied the medication my hospital staff. *See id.* at ¶¶ 52–54. According to the plaintiff, AZT must be administered intravenously to pregnant women during delivery. *See id.* at ¶ 55.

On October 2, 1998, Jane Doe gave birth to a baby girl, Baby Doe. *See id.* at ¶ 56. The plaintiff alleges that after the birth, defendant Stephen Moffitt, M.D., openly discussed Jane Doe's HIV status in front of her family, and notified the plaintiff of the recommended AZT protocol for Baby Doe. *See id.* at ¶¶ 57–59. Jane Doe refused to permit the hospital staff to administer the recommended protocol to Baby Doe. *See id.* at ¶ 59.

The plaintiffs allege that defendants Evelyn Potako and Joanne Dix contacted DYFS and reported that Jane Doe had tested HIV-positive and had refused the recommended AZT protocol. *See id.* at ¶¶ 60–63. Thereafter, the hospital placed Baby Doe in protective custody and defendant Keith Weinberg served the plaintiff with a "hospital hold." *See id.* at ¶ 65. DYFS later obtained a court order that granted emergent medical guardianship over Baby Doe to Capital Health. *See id.* at ¶ 66. Later that day, Jane Doe signed herself out of the hospital and was prevented from taking Baby Doe home with her by hospital security and the Trenton Police Department. *See id.* at ¶¶ 67–69. Capital Health personnel performed laboratory tests on Baby Doe and adminis-

tered the AZT protocol while she was in their custody. *See id.* at ¶¶ 70 and 72. On October 7, 1998, the hospital notified Jane Doe that the meconium screening performed on Baby Doe tested positive for opiates. *See id.* at ¶ 73. On October 8, 1998, a laboratory test indicated that Baby Doe tested positive for HIV exposure. *See id.* at ¶ 77. On October 12, 1998, Jane Doe consented to a urine test, which tested negative for drugs. *See id.* at ¶ 79. A subsequent confirmatory test of Baby Doe's meconium tested negative for opiates. *See id.* at ¶ 96.

On October 16, 1998, pursuant to a court order, Baby Doe was returned to the care and custody of Jane Doe with mandatory in-home visitation by DYFS. *See id.* at ¶ 81. Jane Doe was instructed by DYFS that she was to administer AZT to Baby Doe. *See id.* at ¶ 82. On or about February 22, 1999, Jane Doe notified defendant Andrea Young that she had stopped administering AZT to Baby Doe because the medication was making the child ill. *See id.* at ¶ 86. DYFS filed a motion for temporary custody and accused Jane Doe of abuse and neglect. *See id.* at ¶ 87. On February 24, 1999, the Honorable Gerald J. Council, J.S.C., ordered that Baby Doe submit to medical treatment at the Robert Wood Johnson Hospital in New Brunswick, New Jersey. *See id.* at ¶ 88.

On March 18, 1999, a diagnostic HIV DNA PCR test was performed on Baby Doe at Robert Wood Johnson Hospital, which indicated that Baby Doe was negative for HIV infection. *See id.* at ¶ 89. Accordingly, medical personnel decided that further treatment was unnecessary and Jane Doe was advised that there was no need to bring Baby Doe for additional scheduled AZT treatments. *See id.* at ¶¶ 90–91.

On April 21, 1999, Young filed an affidavit with a court accusing the plaintiff of being drug involved at the time of Baby Doe's birth based on Baby Doe's meconium testing positive for opiates. *See id.* at ¶ 92. At an August 4, 1999 hearing, Jane Doe presented evidence that she was not drug involved and that the meconium screening test was inaccurate. *See id.* at ¶¶ 94–96. The Honorable Laurence Lerner, J.S.C., dismissed the DYFS complaint against the plaintiff. *See id.* at ¶ 97. There is no allegation in the complaint that Jane Doe and Baby Doe ever had any further involvement with either the State Defendants or the Capital Health Defendants.

### B. PROCEDURAL HISTORY

On June 28, 2000, the plaintiffs filed an eleven-count complaint in this Court against the defendants. The plaintiffs assert various statutory and common law claims against non-state actors in Counts I–IV of their complaint. In Count I, the plaintiffs assert a cause of action against Capital Health Systems, Potako and Loeb under Title III of the Americans With Disabilities Act, 42 U.S.C. § 12181, *et seq.* (the "ADA"). In Count II, the plaintiffs assert a cause of action against Capital Health Systems, Potako and Loeb under the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5–1, *et seq.* ("NJLAD"). In Count III, the plaintiffs assert a cause of action against Capital Health System, Bennett, Potako, Dix and Moffitt under the New Jersey Aids Assistance Act, N.J. Stat. Ann. § 26:5C–1, *et seq.* ("NJAAA"). The plaintiffs assert a cause of action for common law tortious interference with parental rights against Capital Health Systems, Potako and Dix in Count IV of the complaint.

In Counts V–XI, the plaintiffs assert various statutory, constitutional and common law claims against some of the State Defendants. The plaintiffs assert a sub-

stantive due process claim under the Fourteenth Amendment to the United States Constitution in Count V alleging that DYFS deprived the plaintiffs of the right to privacy and familial relations. In Count VI, the plaintiffs assert a cause of action against DYFS and Young under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) (the "Rehabilitation Act"). Plaintiffs assert a claim against DYFS and Young in Count VII under the ADA. In Count VIII, the plaintiffs assert a claim against DYFS and Young under NJLAD. In Count IX, the plaintiffs assert a state common law claim against DYFS and Young for failure to investigate. The plaintiffs also assert a state common law claim in Count X against DYFS and Young for negligence. In Count XI, the plaintiffs assert a claim under the New Jersey Constitution against DYFS for violation of Jane Doe's right to privacy.

The plaintiffs seek in their prayer for relief a declaration that the defendants violated the plaintiffs' rights under the United States Constitution, the ADA, the Rehabilitation Act, the New Jersey Constitution, NJLAD and the NJAAA. Additionally, the plaintiffs seek compensatory and punitive money damages, attorneys fees and costs.[2]

In November and December 2000, all of the defendants except Loeb moved to dismiss or for judgment on the pleadings. Apparently in response to the State Defendants' Eleventh Amendment argument, the plaintiffs filed a motion for leave to amend their complaint to "name Charles Venti, the Director of the Division of Youth and Family Services, in his official capacity, as a defendant, name the other DYFS Defendants in their official capacit[ies], and to add a prayer for relief seeking an injunction against future en-

forcement of DYFS's policy of seizing newborns based solely on a mother's HIV status and her refusal to administer AZT to the baby." Plaintiffs' Brief in Support of Motion to Amend Complaint at 1.

### C. CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS

The plaintiffs have asserted different legal claims against the various individual defendants based on their involvement with the plaintiffs. Thus, the Court must identify the specific factual allegations and legal claims asserted against each individual defendant.

#### 1. *DYFS*

Generally, the plaintiffs allege that DYFS became involved with them on or about October 2, 1998 after the birth of Baby Doe when the agency was contacted by Capital Health personnel about Jane Doe's refusal to permit the hospital to administer AZT to Baby Doe. The plaintiffs allege that DYFS violated the plaintiffs' rights when it went to court and obtained orders permitting the hospital to treat Baby Doe notwithstanding Jane Doe refusing consent. Additionally, the plaintiffs allege that DYFS falsely charged Jane Doe with child abuse and neglect based on the first meconium screening's positive test for opiates.

The plaintiffs assert that DYFS's conduct and policies violated the plaintiffs' substantive due process rights to privacy and familial relations, violated the Rehabilitation Act, violated the ADA, violated NJLAD, and violated the New Jersey Constitution. The plaintiffs also assert common law causes of action against DYFS for failure to investigate and for negligence.

---

**2.** In their motion seeking leave to amend the complaint, the plaintiffs seek leave to assert a

claim for prospective injunctive relief, which will be addressed in Part II.A., *infra.*

The plaintiffs seek in their complaint both money damages and declaratory relief against DYFS.

### 2. *Andrea Young*

The plaintiffs allege that Andrea Young was the case manager involved with the plaintiffs' case, and that Young filed a false affidavit in state court charging Jane Doe with being drug involved during her pregnancy. *See* Complaint at ¶¶ 8 and 83. The complaint does not specify whether Young is being sued in her individual or official capacity.

The plaintiffs assert causes of action against Young under the Rehabilitation Act, the ADA, NJLAD, and for state common law failure to investigate and negligence.

### 3. *Cathee Chichester*

The plaintiffs allege that Chichester "was, at all times material, a supervisor employed by Defendant DYFS." *Id.* at ¶ 9. This is the only mention of Chichester in the complaint. The complaint does not indicate whether Chichester is sued in her individual or official capacity, does not assert any particular legal claim against Chichester, and does not allege that Chichester had any direct involvement with the plaintiffs or that Chichester was responsible for DYFS policymaking that affected the plaintiffs.

### 4. *Peggy McHale*

The plaintiffs allege that McHale "was, at all times material, the district office manager employed by Defendant DYFS." *Id.* at ¶ 10. This is the only mention of McHale in the complaint. The complaint does not indicate whether McHale is sued in her individual or official capacity, does not assert any particular legal claim against McHale, and does not allege that McHale had any direct involvement with the plaintiffs or that McHale was responsible for DYFS policymaking that affected the plaintiffs.

### 5. *Keith Weinberg*

The plaintiffs allege that Weinberg was a caseworker employed by DYFS and that he served Jane Doe with a "hospital hold" on or about October 2, 1998, which she refused to sign. *See id.* at ¶¶ 11 and 65. This is the only mention of Weinberg in the complaint. The complaint does not indicate whether Weinberg is sued in his individual or official capacity, does not assert any particular legal claim against Weinberg, and does not allege that Weinberg had any direct involvement with the plaintiffs other than serving a document on Jane Doe on October 2, 1998, or allege that Weinberg was responsible for DYFS policymaking that affected the plaintiffs.

### 6. *Mary Ann St. John*

The plaintiffs allege that St. John "was, at all times material, a caseworker employed by Defendant DYFS." *Id.* at ¶ 12. This is the only mention of St. John in the complaint. The complaint does not indicate whether St. John is sued in her individual or official capacity, does not assert any particular legal claim against St. John, and does not allege that St. John had any direct involvement with the plaintiffs, or allege that St. John was responsible for DYFS policymaking that affected the plaintiffs.

### 7. *Capital Health Systems*

Generally, the plaintiffs allege that Capital Health provided Jane Doe with prenatal care beginning in February 1998, and that it violated the plaintiffs' rights when its employees tested Jane Doe's blood for HIV even though she had withdrawn her consent to be tested, disclosed to the plaintiffs' family and DYFS that the plaintiff

was HIV positive, and disclosed to DYFS that Baby Doe's meconium tested positive for opiates.

The plaintiffs assert causes of action against Capital Health under the ADA, NJLAD, NJAAA and for common law tortious interference with parental rights.

### 8. Evelyn Potako

The plaintiffs allege that Potako was employed as a nurse by Capital Health Systems. *See id.* at ¶ 14. The plaintiffs further allege that Potako contacted DYFS on or about October 2, 1998 and informed DYFS that Jane Doe was HIV positive and that she had refused consent to have the hospital treat Baby Doe. *See id.* at ¶¶ 60 and 62.

The plaintiffs assert claims against Potako under the ADA, NJLAD, NJAAA and for tortious interference with parental rights.

### 9. Joanne Dix

The plaintiffs allege that Dix is a social worker employed by Capital Health Systems. *See id.* at ¶ 15. The plaintiffs further allege that on or about October 2, 1998 Dix contacted DYFS and disclosed that Jane Doe tested HIV positive. *See id.* at ¶ 61.

The plaintiffs assert claims against Dix under NJAAA and for tortious interference with parental rights.

### 10. Betty Bennett

The plaintiffs allege that Bennett is an employee of Capital Health Systems who caused Jane Doe's blood to be tested for HIV notwithstanding the fact that Doe had withdrawn her consent to be tested. *See id.* at ¶¶ 16 and 35.

The plaintiffs assert claims against Bennett under NJAAA only.

### 11. Marietta Cahill

The plaintiffs allege that Cahill is a "nurse/midwife" employed by Capital Health Systems. *See id.* at ¶ 17. This is the only mention of Cahill in the complaint. The plaintiffs do not assert any particular legal claim against Cahill, and do not allege that Cahill had any involvement with the plaintiffs or DYFS.

### 12. Paul Loeb, M.D.

The plaintiffs allege that Dr. Loeb was a doctor employed by Capital Health Systems, who disclosed to the plaintiffs' relatives that Jane Doe was HIV positive and refused to deliver Baby Doe after Jane Doe refused intravenous AZT treatment. *See id.* at ¶¶ 18, 48–49.

The plaintiffs assert claims against Dr. Loeb under the ADA, NJLAD and NJAAA. Dr. Loeb is the only defendant who has not filed a dispositive motion.

### 13. Stephen Moffitt, M.D.

The plaintiffs allege that Dr. Moffitt was employed by Capital Health Systems, and that he openly discussed Jane Doe's HIV status in front of her relatives. *See id.* at ¶¶ 19 and 57.

The plaintiffs assert a claim against Dr. Moffitt under NJAAA only.

## II. DISCUSSION

The Court will first address the plaintiffs' motion seeking leave to file an amended complaint and then turn to the defendants' respective motions to dismiss or for judgment on the pleadings.

### A. PLAINTIFFS' MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT

#### 1. Rule 15 Standard Governing Leave to Amend

 The Federal Rules of Civil Procedure provide that a party may amend his

pleading once before a responsive pleading is served, or thereafter upon leave of court or on consent from his adversary. Fed. R.Civ.P. 15(a). The rule states that "leave should be freely given when justice so provides." *Id.* The decision whether to grant leave to amend rests with the sound discretion of the trial judge and will be overturned on appeal only upon a finding of abuse of discretion. *See Oran v. Stafford,* 226 F.3d 275, 291 (3d Cir.2000) (citation omitted); *Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 654 (3d Cir.1998) (citing *Howze v. Jones & Laughlin Steel Corp.,* 750 F.2d 1208, 1212 (3d Cir.1984)). Additionally, leave can be granted at any time during the litigation, even after judgment or on appeal. *See* 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 1488 (West 1990). "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

The Third Circuit has adopted a particularly liberal approach to the amendment of pleadings to ensure that "a particular claim will be decided on the merits rather than on technicalities." *Dole v. Arco Chemical Co.,* 921 F.2d 484, 486–87 (3d Cir.1990) (citing 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 1471 (West 1990)). However, the allowance should not be automatic. *See Dover Steel Co., Inc. v. Hartford Accident and Indemnity Co.,* 151 F.R.D. 570, 574 (E.D.Pa.1993). Leave should be granted absent a showing of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by

virtue of the allowance of the amendment, futility of amendment, etc." *Foman,* 371 U.S. at 182, 83 S.Ct. 227. *See also Oran,* 226 F.3d at 291; *Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing of the Virgin Islands, Inc.,* 663 F.2d 419, 425 (3d Cir. 1981), *cert. denied sub nom., F.D. Rich Housing of the Virgin Islands v. Government of the Virgin Islands,* 455 U.S. 1018, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982). "Futility of amendment is shown when the claim or defense is not accompanied by a showing of plausibility sufficient to present a triable issue." *Harrison Beverage,* 133 F.R.D. at 468 (internal quotations omitted). *See also Gasoline Sales, Inc. v. Aero Oil Co.,* 39 F.3d 70, 74 (3d Cir.1994); *Reaves v. Sielaff,* 382 F.Supp. 472, 474–75 (E.D.Pa.1974) (denying leave to amend because plaintiff did not have standing to litigate amended claims for injunctive relief). Futility of amendment means that the complaint as amended does not state a claim upon which relief can be granted. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997). If the amendment would not withstand a motion to dismiss, leave must be denied. *See Miller,* 844 F.Supp. at 1001; *see also Fishbein Family P'ship v. PPG Indus., Inc.,* 871 F.Supp. 764, 768 (D.N.J.1994) (applying motion to dismiss standard to claim of "futility of amendment" when third-party defendant sought to name additional party). "This does not require the parties to engage in the equivalent of substantive motion practice upon the proposed new claim or defense; this does require, however, that the newly asserted [claim] appear to be sufficiently well-grounded in fact or law that it is not a frivolous pursuit". *See Harrison,* 133 F.R.D. at 469. Accordingly, "the Court must accept as true the allegations in [the proposed amended complaint] and construe those allegations in the light most favorable to

the [plaintiffs]." *Miller*, 844 F.Supp. at 1001.

Procedurally, Rule 7.1(e)(2) of the Local Civil Rules of the United States District Court for the District of New Jersey ("L.Civ.R.") requires the moving party to attach to their moving papers a copy of the proposed amended pleading. The plaintiffs have not done so.

### 2. *Plaintiffs' Proposed Amendments*

Here, the defendants do not argue that they would suffer prejudice if leave were granted. Rather, the defendants argue that leave should be denied because amendment would be futile.

Apparently after being presented with the State Defendants' motion to dismiss on Eleventh Amendment immunity grounds, the plaintiffs seek leave to amend to "name Charles Venti, the Director of the Division of Youth and Family Services, in his official capacity, as a defendant, name the other DYFS Defendants in their official capacit[ies], and to add a prayer for relief seeking an injunction against future enforcement of DYFS's policy of seizing newborns based solely on a mother's HIV status and her refusal to administer AZT to the baby." Although it is difficult to ascertain the precise contours of the plaintiffs' amended pleading because the plaintiffs did not include a copy of their proposed amended complaint with their moving papers as required by L.Civ.R. 7.1(e)(2), the plaintiffs appear to be attempting to bring their claims within the *Ex Parte Young* exception to state sovereign immunity in response to the defendants' Eleventh Amendment immunity defense by seeking prospective injunctive relief against Venti and the other DYFS defendants in their official capacities.

■■■ The Court concludes that granting the plaintiffs leave to amend would be futile because the plaintiffs cannot satisfy

the constitutionally irreducible minimum standing requirements for their proposed amendments. At a minimum, a plaintiff seeking to invoke the jurisdiction of this Court must establish three elements as an indispensable part of his or her case in order to satisfy the Article III "case or controversy" requirements. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (citations omitted). "First, the plaintiff must have suffered an injury-in-fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant and not . . . th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations and internal quotation marks omitted). When standing is challenged on the basis of the pleadings, as it is here, the Court must accept as true all of the well pled allegations of the complaint and construe the complaint in favor of the plaintiffs. *See Zieper v. Reno*, 111 F.Supp.2d 484, 488 (D.N.J.2000) (citations and internal quotation marks omitted).

■■■ While it appears that the plaintiffs can easily satisfy the standing requirements for past injuries allegedly suffered in 1998 and 1999, a plaintiff seeking prospective injunctive relief must allege a real and immediate threat of future injury. *See Lyons*, 461 U.S. at 101–02, 103 S.Ct. 1660. "Plaintiffs must demonstrate a 'personal stake in the outcome' in order to 'assure that concrete adverseness which sharpens the presentation of issues' neces-

sary for the proper resolution of constitutional questions." *Id.* (citing *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). "Abstract injury is not enough. The plaintiff must show that [s]he ... is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *Id.* (citations and internal quotation marks omitted). Allegations of exposure to illegal conduct in the past alone, without a showing of continuing adverse effects, do not demonstrate a case or controversy entitling a plaintiff to prospective injunctive relief. *See id.* (citing *O'Shea v. Littleton,* 414 U.S. 488, 493, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)). The plaintiffs have failed to allege that there is any concrete threat that they will suffer in the future from the alleged deprivation of rights at the hands of the defendants.

Turning first to Baby Doe's claims, the plaintiffs allege that in March 1999 Baby Doe tested negative for HIV, *see* Complaint at ¶ 89, and that in August 1999 the DYFS complaint alleging abuse and neglect was dismissed by Judge Lerner, *see id.* at ¶ 97. Thus, far from demonstrating a likelihood that Baby Doe will suffer from DYFS's alleged "policy of seizing newborns based solely on a mother's HIV status and [Jane Doe's] refusal to administer AZT to the baby," it is virtually impossible that such injury will occur. According to the allegations of the plaintiffs' own complaint, Baby Doe is HIV negative and is no longer in DYFS's custody or care, nor likely to be subjected to the alleged illegal policy in the future. Baby Doe has claimed only exposure to past illegal conduct, alone, and has failed to allege continuing adverse effects or continued involvement with DYFS and its allegedly illegal policy. Accordingly, the Court concludes that Baby Doe lacks standing to seek injunctive relief.

Similarly, Jane Doe has not alleged a continuing harm or a concrete threat of future harm entitling her to prospective injunctive relief.

First, the plaintiffs' brief submitted in reply to the State Defendants' opposition to their motion for leave to amend misses the point and fails to even cite to the relevant Supreme Court authority governing standing in civil rights cases seeking prospective injunctive relief—*Lyons* and *O'Shea.* Rather, the plaintiffs merely argue that they have standing based on their alleged past injuries alone. As with Baby Doe's claims, Jane Doe no longer has any involvement with DYFS and there is little possibility of future unlawful enforcement of DYFS's alleged policy given Baby Doe's HIV—negative status. Any possible involvement due to any possible future pregnancy is far too speculative to confer standing.

Second, the plaintiffs appear to now be seeking an injunction on behalf of all HIV-positive pregnant women in New Jersey. However, the plaintiffs do not purport to represent a class, and neither in their initial complaint nor in their motion to amend the complaint do the plaintiffs seek class action status. Thus, although the plaintiffs cryptically argue that "[i]ndisputably, Plaintiff Jane Doe has a close relationship with other HIV positive mothers in New Jersey who may decide not to accept treatment for their HIV-exposed newborns," *see* Plaintiffs' Reply at 9, absent class action status, that argument is irrelevant. Without seeking class action status, a plaintiff may only seek relief necessary to remedy her particular claim. *See Bowers v. National Collegiate Athletic Ass'n,* 118 F.Supp.2d 494, 503 (D.N.J. 2000) (citation omitted). The plaintiffs' attempt to seek injunctive relief on behalf of

all HIV-positive pregnant women with whom she has a "close relationship" who refuse consent to have their newborns treated for the disease is legally deficient.

▮▮▮▮ Finally, this is not a case that is capable of repetition yet evading review. *See Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (citations omitted). First, it should be noted that unlike in *Roe v. Wade*, the plaintiffs' claims for money damages and declaratory relief have not become moot in the intervening time between injury and adjudication. Rather, the Court has concluded that the plaintiff lacks standing to assert a claim for prospective relief only. *See Davis v. Thornburgh*, 903 F.2d 212, 222 (3d Cir.), *cert. denied sub nom. Davis v. Cohen*, 498 U.S. 970, 111 S.Ct. 436, 112 L.Ed.2d 420 (1990). Moreover, whether the defendants violated the plaintiff's rights remains to be litigated and, thus, their claims in no sense "evade review." Additionally, the plaintiffs had an opportunity to raise and litigate these very federal and state constitutional, statutory and common law claims in the state enforcement proceeding initiated by DYFS, yet apparently failed to do so. Moreover, the "capable of repetition yet evading review" exception to the standing requirement is applicable only in "exceptional situations, and generally where the named plaintiff can make a reasonable showing that [s]he will again be subjected to the alleged illegality." *Lyons*, 461 U.S. at 109, 103 S.Ct. 1660. Here, the plaintiff has not made such a showing. It is mere conjecture that this HIV-positive plaintiff will again become pregnant; that she will again grant and then withdraw consent to be tested for HIV; that she will again refuse treatment during the pregnancy, labor and delivery; that her newborn child will again initially test positive for HIV exposure; and that she will again refuse AZT or some other yet-to-be-developed treatment for the potentially HIV-positive newborn. Jane Doe has not demonstrated a reasonable likelihood that she will again be subjected to claimed illegal conduct at the hands of DYFS personnel.

Accordingly, the plaintiffs' motion for leave to file an amended complaint is denied because the proposed amendment would be futile.

**B. THE STATE DEFENDANTS' MOTION TO DISMISS**

DYFS, Young, Chichester, McHale, Weinberg and St. John move to dismiss the plaintiffs' claims asserted against them under the Fourteenth Amendment, the Rehabilitation Act, the ADA, NJLAD, for common law failure to investigate and negligence, and for violation of the plaintiffs' right to privacy under the New Jersey Constitution.

*1. Rule 12(b) Standards Governing Motions to Dismiss*

A motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(6) may be granted only if, accepting all well pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief. *See Oran v. Stafford*, 226 F.3d 275, 279 (3d Cir.2000) (citation omitted); *Langford v. City of Atlantic City*, 235 F.3d 845, 850 (3d Cir.2000) (citation omitted); *Bartholomew v. Fischl*, 782 F.2d 1148, 1152 (3d Cir.1986); *Angelastro v. Prudential–Bache Sec., Inc.*, 764 F.2d 939, 944 (3d Cir.), *cert. denied*, 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985). The Court may not dismiss a complaint unless plaintiff can prove no set of facts that would entitle her to relief. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Angelastro*, 764 F.2d at 944. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer

evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). In setting forth a valid claim, a party is required only to plead "a short plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a).

Under Rule 12(b)(6), the Court must "accept the allegations in the complaint as true, and draw all reasonable factual inferences in favor of the plaintiff. [The motion can be granted] only if no relief could be granted under any set of facts that could be proved." *Turbe v. Government of the Virgin Islands,* 938 F.2d 427, 428 (citing *Unger v. National Residents Matching Program,* 928 F.2d 1392, 1394–95 (3d Cir. 1991)); *see also Langford,* 235 F.3d at 850; *Dykes v. Southeastern Pennsylvania Transp. Auth.,* 68 F.3d 1564, 1565, n. 1 (3d Cir.1995); *Piecknick v. Commonwealth of Pennsylvania,* 36 F.3d 1250, 1255 (3d Cir. 1994); *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir. 1994). A complaint may be dismissed for failure to state a claim where it appears beyond any doubt that no relief could be granted under any set of facts which could be proved consistent with the allegations. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

▇▇▇ A complaint should not be dismissed unless it appears beyond doubt that "the facts alleged in the complaint, even if true, fail to support the claim." *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988). Legal conclusions made in the guise of factual allegations, however, are given no presumption of truthfulness. *See Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *see also Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997) ( "[A] court need not credit a complaint's 'bald asser-

tions' or 'legal conclusions' when deciding a motion to dismiss").

▇▇▇ A district court reviewing the sufficiency of a complaint has a limited role. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support his [or her] claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Generally, when conducting such an inquiry, material beyond the pleadings should not be considered. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997); *Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.), *cert. denied,* 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994); *Gannon v. Continental Ins. Co.,* 920 F.Supp. 566, 574 (D.N.J.1996).

### 2. *Plaintiffs' Claims Against Chichester, McHale, Weinberg and St. John*

▇▇▇ Before turning to the State Defendants' arguments with respect to sovereign, absolute and qualified immunity, the Court must address a threshold deficiency in the plaintiffs' claims against Chichester, McHale, Weinberg and St. John—the complaint fails to allege anything that can even remotely be considered a legal claim against these defendants.

With respect to Chichester and McHale, the only allegations against these defendants is that they were supervisors or managers employed by DYFS. *See* Complaint at ¶¶ 9–10.

▇▇▇▇ "It is well settled that the doctrine of respondeat superior may not be employed to impose liability on a supervisor for the conduct of a subordinate which violates a citizen's constitutional rights." *Blanche Road Corp. v. Bensalem Twp.,* 57 F.3d 253, 263 (3d Cir.1995). In short, there is no vicarious liability under

§ 1983. *See C.H. ex rel. Z.H. v. Oliva,* 226 F.3d 198, 202 (3d Cir.2000). A state official may be held liable under § 1983 in a supervisory capacity only if they have exercised or failed to exercise supervisory authority; thus, a plaintiff asserting a failure to supervise claim must also allege "both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval." *Id.* The plaintiffs have alleged neither that Chichester and McHale had knowledge of a pattern of incidents similar to the plaintiffs' situations, nor that they acted in such a manner as to communicate approval of the allegedly illegal practices of their subordinates.

Accordingly, to the extent that the plaintiffs have asserted § 1983 claims against Chichester and McHale in their individual capacities, those claims must be dismissed for failure to state a claim upon which relief can be granted.

■ Similarly, with respect to St. John and Weinberg, the only allegations in the plaintiffs' complaint are that they were caseworkers employed by DYFS, *see* Complaint at ¶¶ 11–12, and that Weinberg served the plaintiff with a "hospital hold," *see id.* at ¶ 64. Civil liability may be imposed under 42 U.S.C. § 1983 upon "any person who, acting under the color of state law, deprives another of any rights, privileges, or immunities secured by the Constitution or the laws of the United States." *Gruenke v. Seip,* 225 F.3d 290, 298 (3d Cir.2000). Section 1983 does not create any new rights, but only provides a remedy for "the violation of a federal constitutional or statutory right." *Id.* (citing *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). To establish a federal claim under § 1983,

plaintiff must show that the conduct of the defendants, under color of state law, deprived him of a federal constitutional or statutory right. *See Gruenke,* 225 F.3d at 298. To the extent that the plaintiffs assert claims against St. John and Weinberg under § 1983, the plaintiffs have failed to allege any deprivation of a federal constitutional or statutory right.

Accordingly, the plaintiffs' § 1983 claims asserted against St. John and Weinberg also must be dismissed.

### 3. *Eleventh Amendment Immunity*

■ In Count V of the complaint, the plaintiffs assert a § 1983 claim against DYFS alleging that DYFS violated the plaintiffs' substantive due process rights to privacy and familial relations under the Fourteenth Amendment. *See* Complaint at ¶¶ 145–54. The State Defendants argue that DYFS, as an agency of the State, is immune from suit in federal court under the Eleventh Amendment of the United States Constitution. The plaintiffs counter that their claim for declaratory judgment brings their § 1983 claim with the *Ex Parte Young* exception to state sovereign immunity. The plaintiffs appear to have abandoned their claim for money damages against DYFS.

■ The Eleventh Amendment provides:

The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. The Eleventh Amendment does not explicitly prohibit lawsuits by a State's own citizens, but the United States Supreme Court "has consistently held that an unconsenting State is

immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelman v. Jordan,* 415 U.S. 651, 662–663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Thus, "for over a century now, [the Supreme Court has] made clear that the Constitution does not provide for federal jurisdiction over suits against nonconsenting States." *Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (citing *College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999); *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996)). Therefore, absent waiver, neither a State, nor agencies under its control may be subjected to lawsuits in federal court. *See Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 144, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993); *Welch v. Texas Dep't of Highways and Public Transp.,* 483 U.S. 468, 473, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987). Eleventh Amendment immunity constitutes an affirmative defense and, as such, it must be shown by the party seeking to assert the benefit of immunity. *See Christy v. Pennsylvania Tpk. Comm'n,* 54 F.3d 1140, 1144 (3d Cir. 1995). "The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Board of Trustees of the Univ. of Alabama v. Garrett,* 531 U.S. 356, 121 S.Ct. 955, 962, 148 L.Ed.2d 866 (2001) (citing *Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000)).

■ However, this broad grant of immunity has been qualified by the judicial doctrine of *Ex Parte Young,* which allows suits against States in federal court seeking prospective injunctive relief to proceed only against state officials acting in the official capacities. *See Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The exception created by *Ex Parte Young* has been interpreted to allow suits against state officials for prospective and declaratory relief in order to end continuing violations of federal law. *See Balgowan v. State of New Jersey,* 115 F.3d 214, 217 (3d Cir.1997). The doctrine announced in *Ex Parte Young* ensures that state officials do not use the Eleventh Amendment as a method for avoiding compliance with federal law. *See Metcalf,* 506 U.S. at 146, 113 S.Ct. 684 (citing *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985)). This exception to the Eleventh Amendment is a very narrow one, permitting plaintiffs to seek prospective relief, and only when a state official and not the State or a state agency is the named defendant. *See Metcalf,* 506 U.S. at 146, 113 S.Ct. 684. The exception has no application where the lawsuit, although naming a state official, is more correctly construed as a suit against the State, which is completely barred by the Eleventh Amendment regardless of the relief sought. *See id.*

■ The determination of whether the State rather than the named state official is really the party at interest generally turns on the relief sought. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Lawsuits seeking retroactive relief, usually in the form of monetary damages and declaratory judgment for past conduct, against a state official are generally construed as suits against the State because a judgment for damages against an official would necessarily require payment from the government. *See Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945). However, it is clear that "a state official in his or her official capacity, when sued for injunctive relief, would be a per-

son under § 1983 because 'official capacity actions for prospective relief are not treated as actions against the State.'" *Will,* 491 U.S. at 71 n. 10, 109 S.Ct. 2304; *see also Hafer v. Melo,* 502 U.S. 21, 30, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) (holding that the Eleventh Amendment provides no shield for a state official confronted by a claim that he deprived another of a federal right).

■ Therefore, a suit for prospective equitable relief challenging the constitutionality of a state official's action does not constitute a lawsuit against the State. *See Death Row Prisoners of Pennsylvania v. Ridge,* 948 F.Supp. 1258, 1265 (E.D.Pa. 1996) (quoting *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). In other words, the United States Supreme Court has recognized the "accepted rule" that federal court actions to restrain activities of state officials do not violate the Eleventh Amendment if the action plaintiff seeks to enjoin violates the Constitution. *See Cory v. White,* 457 U.S. 85, 89, 102 S.Ct. 2325, 72 L.Ed.2d 694 (1982).

Here, the plaintiffs seek in their complaint money damages and a declaratory judgment based on past conduct against the State Defendants. In their opposition to the defendants' motion, the plaintiffs appear to have abandoned their claim for money damages, but argue that their claim for a declaratory judgment falls within the *Ex Parte Young* exception. *See* Plaintiffs' Opposition at 13–14. The plaintiffs' argument, however, ignores well settled Supreme Court precedent "that the Eleventh Amendment to the United States Constitution and applicable principles governing the issuance of declaratory judgments forbid the award of [a declaration that defendants' prior conduct violated federal law]." *Green v. Mansour,* 474 U.S. 64, 65, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985). That is

precisely what the plaintiffs seek here—a declaration that DYFS's past conduct violated federal law.

Thus, the Court concludes that the plaintiffs' § 1983 claims against DYFS seeking money damages and declaratory relief are barred by the Eleventh Amendment. Accordingly, the State Defendants motion to dismiss Count V of the plaintiffs' complaint must be granted.

*4. Title II of the ADA and the State's Sovereign Immunity*

■ In Count VII of the complaint, the plaintiffs assert a claim against DYFS under Title II of the ADA. *See* Complaint at ¶¶ 170–82. The plaintiffs argue that their ADA claims survive Eleventh Amendment scrutiny because Congress expressly abrogated state sovereign immunity in the act, and that Congress had the constitutional authority to do so. This Court rejects the plaintiffs' argument in light of the Supreme Court's recent decision in *Board of Trustees of the Univ. of Alabama v. Garrett,* 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001).

■ In order to determine whether Congress abrogated the State's Eleventh Amendment immunity under Title II of the ADA, the Court must ask and answer two questions: i) whether Congress made an unequivocal expression of its intent to abrogate immunity; and ii) whether Congress acted pursuant to a valid exercise of power. *See Seminole Tribe,* 517 U.S. at 55, 116 S.Ct. 1114 (citations omitted). As to the first question, it is undisputed that Congress made an unequivocal expression of its intent in the ADA to abrogate Eleventh Amendment immunity. *See* 42 U.S.C. § 12101(b)(4); *Garrett,* 121 S.Ct. at 962 n. 3. However, Congress has the constitutional power to authorize suits brought by individuals against the State in only two circumstances: i) when acting to

enforce the Fourteenth Amendment; and ii) when the State consents to suit. *See College Savings,* 527 U.S. at 670, 119 S.Ct. 2219 (citations omitted).

In *Garrett,* the Supreme Court held that Congress did not validly abrogate state sovereign immunity when it enacted Title I of the ADA. *See Garrett,* 121 S.Ct. at 967–68. The Court is presented here with the question expressly left open by the Supreme Court in *Garrett*—whether Congress validly abrogated the States' Eleventh Amendment sovereign immunity from suits in federal court in Title II of the ADA. *See id.* at 960 n. 1.

Nor has the United States Court of Appeals for the Third Circuit addressed the issue. In *Lavia v. Pennsylvania,* 224 F.3d 190, 206 (3d Cir.2000), which was decided before the Supreme Court's decision in *Garrett,* the Third Circuit held that Congress exceeded its constitutional authority to abrogate state sovereign immunity when it enacted Title I of the ADA. While the circuit has not yet addressed whether Congress validly abrogated state sovereign immunity in Title II of the act, in *Yeskey v. Pennsylvania,* 118 F.3d 168 (3d Cir.1997), *aff'd,* 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998), the court held, without addressing the question of Eleventh Amendment immunity, that Title II of the ADA applied to state prisoners. Other courts within this circuit as well as other circuit and district courts are split on the issue of States' Eleventh Amendment immunity under Title II. *See Alsbrook v. City of Maumelle,* 184 F.3d 999, 1012 (8th Cir. 1999), *cert. granted sub nom., Alsbrook v. Arkansas,* 528 U.S. 1146, 120 S.Ct. 1003,

145 L.Ed.2d 947, *cert. dismissed,* 529 U.S. 1001, 120 S.Ct. 1265, 146 L.Ed.2d 215 (2000) (holding that claim brought under Title II of the ADA against the State was barred under the Eleventh Amendment); *Walker v. Snyder,* 213 F.3d 344, 346–47 (7th Cir.2000), *cert. denied sub nom., United States v. Snyder,* —— U.S. ——, 121 S.Ct. 1188, 149 L.Ed.2d 104 (2001) (holding that claims brought against the State under Title II of the ADA must be brought in state rather than federal court); *Brown v. North Carolina Div. of Motor Vehicles,* 166 F.3d 698, 708 (4th Cir.1999), *cert. denied,* —— U.S. ——, 121 S.Ct. 1186, 149 L.Ed.2d 103 (2001) (holding that Congress did not validly abrogate state sovereign immunity in enacting regulation under Title II of the ADA prohibiting the imposition of surcharges); *Wesley v. Vaughn,* Civ. No. 99–1228, 1999 WL 1065209, *8 (E.D.Pa. Nov.18, 1999) (holding that Title II of the ADA as applied to the facts of that case was not a valid exercise of Congress's power under § 5 of the Fourteenth Amendment); *Moyer v. Conti,* Civ. No. 99–744, 2000 WL 1478791, *6 (E.D.Pa. Oct.5, 2000) (finding that the reasoning of the Third Circuit's *Lavia* decision with respect to Title I applies to Title II as well and holding that Congress did not validly abrogate state sovereign immunity under Title II of the ADA).[3] *But see Dare v. California,* 191 F.3d 1167, 1176 (9th Cir. 1999), *cert. denied,* —— U.S. ——, 121 S.Ct. 1187, 149 L.Ed.2d 103 (2001) (holding that Title II is appropriate legislation under § 5 of the Fourteenth Amendment); *Coolbaugh v. Louisiana,* 136 F.3d 430, 438 (5th Cir.), *cert. denied,* 525 U.S. 819, 119 S.Ct. 58, 142 L.Ed.2d 45 (1998) (same)[4];

---

**3.** In *Popovich v. Cuyahoga County Court of Common Pleas,* 227 F.3d 627, 641–42 (6th Cir.2000), the court held that Congress exceeded its § 5 enforcement authority when it abrogated state Eleventh Amendment immunity in Title II of the ADA, but later vacated

that opinion upon granting a petition for a rehearing *en banc.* No published decision had issued on the *en banc* rehearing as of the date this opinion was filed.

**4.** In *Shaboon v. Duncan,* 252 F.3d 722, 737 (5th Cir.2001), the Fifth Circuit remanded a

*Patricia N. v. Lemahieu,* 141 F.Supp.2d 1243, 1249 (D.Haw.2001) (following Ninth Circuit precedent and holding that Congress validly abrogated Eleventh Amendment immunity in Title II of the ADA); *Project Life, Inc. v. Glendening,* 139 F.Supp.2d 703, 707 n. 5 (D.Md.2001) (permitting a jury award against the State to stand in case brought under Title II of the ADA); *Jones v. Pennsylvania,* Civ. No. 99–4212, 2000 WL 15073, *1 (E.D.Pa. Jan.5, 2000) (denying state defendants' motion to dismiss ADA claim on Eleventh Amendment grounds).

As noted above, in *Garrett,* the Supreme Court considered whether Congress abrogated States' Eleventh Amendment immunity through a valid exercise of constitutional authority in Title I of the ADA, 42 U.S.C. §§ 12111–12117. *See Garrett,* 121 S.Ct. at 960. After discussing briefly the concept of sovereign immunity, the Court recognized "that Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority." *Id.* at 962 (quoting *Kimel,* 528 U.S. at 73, 120 S.Ct. 631) (citations and internal quotation marks omitted). Here, as in *Garrett,* the first of these requirements is not in dispute. Congress expressly stated in the ADA that the States shall not be immune from suits in federal court under the act. *See* 42 U.S.C. § 12202. The *Garrett* Court held that although Congress expressly abrogated the States' immunity, it did not have the constitutional authority to do so under Section 5 of the Fourteenth Amendment. *See id.* at 967–68.

While not on its face dispositive of plaintiffs' Title II ADA claims, the Court is guided by the reasoning of the *Garrett*

decision, which suggests that the Court would have reached the same result under Title II of the ADA as it did under Title I. In reaching its decision, the *Garrett* Court recognized the now well settled rule that States' Eleventh Amendment immunity is necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment, and that "Congress may subject nonconsenting States to suit in federal court when it does so pursuant to a valid exercise of its § 5 power." *Garrett,* 121 S.Ct. at 962 (citation omitted). The Court then analyzed "the limitations § 1 of the Fourteenth Amendment places upon States' treatment of the disabled." *Id.* at 963. The Court concluded that under its prior precedent in *Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), the disabled were not a suspect or quasi-suspect classification and, therefore, state laws affecting the disabled were subject to rational basis review. *See id.* Having determined the scope of Fourteenth Amendment protections afforded the disabled, the Court proceeded to examine whether Congress had identified a history and pattern of irrational employment discrimination against the disabled, and concluded that Congress had not. *See id.* at 964–65. While the Court's analysis was restricted to Congressional findings made with respect to employment discrimination by the States, the Court found that the duty imposed by the ADA on employers to accommodate the disabled "far exceeds what is constitutionally required in that it makes unlawful a range of alternate responses that would be reasonable but would fall far short of imposing an 'undue burden' on an employer." *Id.* The Court held that in all cases where Congress attempts to abrogate sovereign im-

---

case back to the district court to examine in the first instance whether the Supreme Court's decision in *Garrett* with respect to

Title I of the ADA alters the law in the Fifth Circuit with respect to Title II.

munity, "the remedy imposed by Congress must be congruent and proportional to the targeted violation," and found that the Title I of the ADA did not pass constitutional muster. *See id.* at 967–68.

This Court concludes that, as applied here, Congress did not have the constitutional authority under § 5 of the Fourteenth Amendment when it enacted Title II of the ADA, because Congress did not identify a pattern of discrimination against HIV-positive pregnant women, or any other disabled individuals, at the hands of state child welfare agencies, and the remedies available under Title II are not congruent and proportional to the targeted discrimination.

■■■ The Court must be mindful that "[i]t is for Congress in the first instance to determine whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment, and its conclusions are entitled to much deference." *Kimel,* 528 U.S. at 80–81, 120 S.Ct. 631 (quoting *City of Boerne v. Flores,* 521 U.S. 507, 517, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)) (internal quotation marks omitted). However, while Congress has the power to enforce the Fourteenth Amendment, it is the province of the courts to define the substantive restrictions the Amendment places on the States. *See id.* at 81, 120 S.Ct. 631 (quoting *City of Boerne,* 521 U.S. at 519, 117 S.Ct. 2157). The Supreme Court has held "that States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions towards such individuals are rational." *Garrett,* 121 S.Ct. at 964. Thus, in order for Title II of the ADA to be a valid exercise of Congressional authority under § 5 of the Fourteenth Amendment, Congress must identify a pattern of irrational discrimination against the disabled by the States, and not merely identify the States' failure to accommodate the disabled.

■■■ Before beginning the analysis, however, it must be noted that the Court is presented here with a rather narrow claim—that the plaintiffs were discriminated against by state officials who were implementing DYFS policies directed against HIV-positive pregnant women. The plaintiffs do not indicate in their complaint or in their opposition papers which specific subsections of Title II of the ADA or which regulations enacted thereunder were violated by the defendants, so it is difficult to ascertain the precise legal contours of their claims. But in any event, the Court is constrained to formulate constitutional rules only to the extent necessary to resolve the issues and factual scenario before it. *See Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 501–02, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985) (citations omitted). Therefore, the Court's analysis and holding here is limited to the issue before it—whether Congress validly abrogated state sovereign immunity in Title II of the ADA as applied to these plaintiffs and to their claims based on the alleged DYFS policy of separating HIV-positive newborns from their HIV-positive mothers when the mother refuses to consent to treatment. It must be emphasized that the Court's holding in no way calls into question the broad remedial provisions of Title II directed at the physical accessibility of state facilities and public modes of transportation, *see, e.g.,* 42 U.S.C. §§ 12141–12165 and 28 C.F.R. §§ 35.150–35.151 (2000), or any other provisions of Title II. Those provisions of Title II are not before the Court.

■■■ Turning to the issue that is before the Court, there is no indication in the Congressional record that Congress identified a pattern of irrational discrimination against the disabled in the policies

and practices of state child welfare agencies directed towards HIV-positive mothers. The dissent in *Garrett* argued that Congress had made the requisite findings of general systemic irrational discrimination against the disabled at the hands of state officials. *See Garrett,* 121 S.Ct. at 970 (Breyer, J., dissenting). Attached as Appendix C to Justice Breyer's dissent in *Garrett,* which was joined by Justices Stevens, Souter and Ginsberg, is a list of submissions made to the "Task Force on Rights and Empowerment of Americans with Disabilities." *See Garrett,* 121 S.Ct. at 977–93. The *Garrett* majority found that Appendix C did not contain legislative findings but, rather, reflected "unexamined, anecdotal accounts of 'adverse, disparate treatment by state officials.'" *Id.* at 966. Moreover, the majority noted that Appendix C did not contain submissions that were made to Congress but, rather, submissions made to the "Task Force on the Rights and Empowerment of Americans with Disabilities." *See id.* However, even if the anecdotal submissions catalogued in Appendix C were legislative findings, those submissions barely mention discrimination against the disabled at the hands of child welfare agencies, and fall far short of Congressional findings of a pattern of irrational discrimination. The vast majority of instances of discrimination against the disabled at the hands of state officials identified in Appendix C involve limited access to public buildings and public transportation facilities. State child welfare agencies are mentioned only three times. The task force identified one instance where "California Children's Services refused to help with [the] cost of caring for [a] child with [a] head injury," identified one instance

where the Massachusetts Office for Children refused to license a blind person as a day care assistant, and one instance where the Massachusetts Adoption Exchange refused to let a mother with muscular dystrophy adopt a child. *See id.* at 979 and 986. Even if these submissions to the task force were considered legislative findings, which the *Garrett* majority clearly found they were not, the Court concludes that the submissions do not rise to the level of a pattern of irrational state discrimination against the disabled in the administration of child welfare agencies.

■ Additionally, the duty of accommodation imposed on the States under Title II far exceeds what is constitutionally mandated. While Congress has "wide latitude" in determining what remedial measures are needed to cure societal problems, when abrogating state sovereign immunity the remedial requirements imposed on States must be congruent and proportional to the identified injury in relation to that which is constitutionally mandated. *See Kimel,* 528 U.S. at 81, 120 S.Ct. 631 (quoting *City of Boerne,* 521 U.S. at 520, 117 S.Ct. 2157). *Cf. Lizzi v. Alexander,* 255 F.3d 128, 135 (4th Cir. 2001) (quoting *Kimel,* 528 U.S. at 82, 120 S.Ct. 631 (quoting *City of Boerne,* 521 U.S. at 532, 117 S.Ct. 2157)) (holding that "the substantive requirements of the [Family Medical Leave Act] are so out of proportion to the supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior.") (internal quotation marks omitted). As noted above, States are not constitutionally mandated to make special accommodations for their disabled citizens. *See Garrett,* 121 S.Ct. at 964. Rather, States must refrain from irrational discrimination against the disabled; discrimination that is not rationally related to a legiti-

mate governmental purpose. *See City of Cleburne*, 473 U.S. at 446, 105 S.Ct. 3249.

▬ Title II and the regulations enacted thereunder require far more of the States than that which is constitutionally mandated. Title II prohibits discrimination against "qualified individual[s] with a disability." 42 U.S.C. § 12132. A qualified individual is defined under the act as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). Thus, Title II places an affirmative duty on the States, a duty not mandated by the Constitution, to modify rules, policies and practices to accommodate the disabled. Moreover, Congress instructed the Attorney General to enact regulations to enforce Title II. *See* 42 U.S.C. § 12134. Among other things, those regulations require the States to perform self-evaluations of their existing policies and practices, *see* 28 C.F.R. § 35.105, appoint an employee responsible for compliance with the ADA and its regulations, *see* 28 C.F.R. § 35.107, and make all of its existing programs and facilities accessible to disabled citizens, *see* 28 C.F.R. § 35.149. As discussed above, because the disabled are not considered either a suspect or a quasi suspect classification, the Fourteenth Amendment imposes no such requirements on the States when providing services to their disabled citizens. *See Garrett*, 121 S.Ct. at 964; *City of Cleburne*, 473 U.S. at 446, 105 S.Ct. 3249. State child welfare agencies are under no affirmative constitutional duty to perform such self-evaluation, appoint responsible employees, and amend their policies and practices to accommodate the HIV-positive citizens with whom they come in contact. Thus, the remedial requirements imposed by Congress, as applied here, far surpass that which is constitutionally mandated.

Accordingly, the Court concludes that Congress exceeded its constitutional authority under § 5 of the Fourteenth Amendment when it purported to abrogate State sovereign immunity and subjected States to suit in federal court based on child welfare policies directed at HIV-positive mothers. Therefore, DYFS's motion to dismiss Count VII of the plaintiffs' complaint must be granted.

### 5. *Individual Liability Under Title II of the ADA*

The plaintiffs also assert a claim against Young in Count VII of the complaint under Title II of the ADA.

▬ Title II prohibits discrimination by, and imposes liability on, "public entities." *See* 42 U.S.C. ¶ 2132. A public entity is defined in the statute as "any State or local government; ... department, agency special purpose district, or other instrumentality of a State...." 42 U.S.C. § 12131(1). There is no reference anywhere in Title II to individual liability for violation of the act. Therefore, the Court concludes that there is no individual liability under Title II of the ADA. *Accord Yeskey v. Pennsylvania*, 76 F.Supp.2d 572, 575 (M.D.Pa.1999).

Accordingly, to the extent that Count VII of the plaintiff's complaint asserts a claim against Young in her individual capacity under Title II of the ADA, the defendants' motion to dismiss that claim must be granted.

### 6. *Plaintiffs' Rehabilitation Act Claims Against DYFS and Young*

▬ In Count VI of the complaint, the plaintiffs assert claims under Section 504 of the Rehabilitation Act against DYFS

and Young. *See* Complaint at ¶¶ 156–68. The State Defendants argue that the plaintiffs have failed to state a claim under the Rehabilitation Act.

a) *Plaintiffs' claim under the Rehabilitation Act.*

■ Section 504 of the Rehabilitation Act provides, in pertinent part: "No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. ..." 29 U.S.C. § 794(a). The act defines an "individual with a disability" as a person that "has a physical or mental impairment, which substantially limits one or more of such person's major life activities; has a record of such an impairment; or is regarded as having such an impairment." 29 U.S.C. § 705(20)(B). While both Title II of the ADA and § 504 of the Rehabilitation Act proscribe discrimination on account of disability by public entities, the Rehabilitation Act applies only to entities that receive federal financial assistance, while the ADA applies to all public entities whether they receive federal funds or not. *See Yeskey,* 118 F.3d at 170. Both statutes otherwise are interpreted similarly. *See Doe v. County of Centre, PA,* 242 F.3d 437, 446 (3d Cir.2001); *Yeskey,* 118 F.3d at 170.

■ In order to state a claim under the Rehabilitation Act, the plaintiffs must allege that: i) they are disabled; ii) that they were "otherwise qualified" for the benefit sought or for participation in the program; iii) that they were excluded from participation in, denied the benefit of, or subject to discrimination "solely by reason of ... their disability;" and iv) that the "program or activity receives federal financial assistance." *See Bowers v. National*

*Collegiate Athletic Ass'n,* 118 F.Supp.2d 494, 525 (D.N.J.2000) (quoting 29 U.S.C. § 794(a)). It is by now well settled that Jane Doe's HIV-positive status and Baby Doe's initial HIV-positive status constitutes a disability under the Rehabilitation Act. *See County of Centre,* 242 F.3d at 447; *see also Bragdon v. Abbott,* 524 U.S. 624, 655, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (holding HIV-positive individual is disabled under the ADA). Additionally, the defendants do not dispute that DYFS receives federal financial assistance or that the plaintiffs were qualified to receive benefits or services from DYFS. *See* 29 U.S.C. § 794(b) (defining broadly "programs or activities" subject to the act); 28 C.F.R. § 42.540 (2000) (same). The only issue raised with respect to the plaintiffs' Rehabilitation Act claim is whether the plaintiffs were denied benefits or discriminated against solely by reason of their disability.

In *Doe v. County of Centre,* the court held that a county child welfare policy that required the notification and consent of biological or custodial parents before placing their child in a foster home with HIV-positive individuals treated the foster parents differently based solely on the HIV status of their child and, thus, the plaintiffs in that case had stated a claim under the Rehabilitation Act. *See County of Centre,* 242 F.3d at 447.

Here, the plaintiffs allege that DYFS "has a policy of removing HIV exposed newborns from their parents based solely on maternal HIV status and without investigating allegations of abuse and neglect," *see* Complaint at ¶ 161, and further allege that Young, acting in furtherance of that policy, filed a false affidavit with the state court indicating that the plaintiff was drug involved during her pregnancy based solely on Jane Doe's HIV status, *see* Complaint ¶ 162. DYFS denies that it has such a policy.

At this stage of the litigation on a motion to dismiss, the Court must accept as true all of the well pled allegations of the complaint, and draw every inference in favor of the non-moving party. Therefore, it appears that the plaintiffs have stated a claim under the Rehabilitation Act. Jane Doe is an individual with a disability who alleges that she was discriminated against by DYFS, which receives federal financial assistance. Doe alleges that she was treated differently from HIV-negative mothers based solely on her HIV status in that she was denied the right to make decisions with respect to Baby Doe's medical treatment.

Accordingly, the defendants' motion to dismiss the plaintiffs' Rehabilitation Act claim must be denied.[5]

b) *Young is entitled to qualified immunity.*

 Even though the Court concludes that the plaintiffs have stated a claim under the Rehabilitation Act against DYFS and Young, the plaintiffs' Rehabilitation Act claim against Young must be dismissed because Young is entitled to the defense of qualified immunity.

 "The doctrine of qualified immunity 'hold[s] that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *County of*

*Centre*, 242 F.3d at 453–54 (quoting *Elder v. Holloway*, 510 U.S. 510, 516, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994)). In determining whether Young is immune from suit, the Court must determine i) whether the plaintiffs alleged a violation of their statutory or constitutional rights; ii) whether the right alleged to have been violated was clearly established in the existing law at the time of the violation; and iii) whether a reasonable official should have known that the alleged action violated the plaintiffs' rights. *See id.* at 454 (quoting *Rouse v. Plantier*, 182 F.3d 192, 196–97 (3d Cir.1999)); *see also Michaels v. New Jersey*, 222 F.3d 118, 121 (3d Cir. 2000) (citations omitted). The determination of whether a defendant is entitled to a defense of qualified immunity is a question of law for the Court to decide. *See Michaels*, 222 F.3d at 121 (citation omitted).

 Here, as discussed above, the plaintiffs have stated a claim that Young violated a federal statutory right under the Rehabilitation Act. However, far from being clearly established, the plaintiffs' Rehabilitation Act claim is somewhat novel. "To defeat qualified immunity, [the plaintiffs must show that] this right [was] sufficiently clear such that a reasonable official would have known that enacting and applying [DYFS's] policy would have violated the right." *County of Centre*, 242 F.3d at 454 (citing *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The plaintiffs have not come forward with a single reported decision

---

5. The State Defendants do not argue that they are immune from suit under the Eleventh Amendment on the plaintiffs' Rehabilitation Act claims; nor could they. Although the Supreme Court held in *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) that Congress did not expressly waive sovereign immunity under the Rehabilitation Act, Congress subsequently amended the act to provide for the express waiver required by Supreme Court precedent. *See Lane v. Pena*, 518 U.S. 187, 198, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996) (recognizing Congress's expression of unequivocal waiver in response to *Atascadero* ); *Yeskey v. Commonwealth of Pennsylvania Dep't of Corrections*, 118 F.3d 168, 172–73 (3d Cir.1997) (recognizing amendments to Rehabilitation Act as providing clear expression of congressional intent).

clearly establishing this right, and the Court's own research has uncovered no decisions. That parents have a liberty interest protected by the Fourteenth Amendment to the care, custody and nurture of their children, as well as the primary responsibility to consent to children's medical treatment, is clearly established. *See, e.g., Parents United for Better Sch., Inc. v. School Dist. of Philadelphia Bd. of Educ.*, 148 F.3d 260, 274–75 (3d Cir.1998) (citations omitted). However, as discussed more fully above, the plaintiff's substantive due process claims under the Fourteenth Amendment asserted against DYFS fail as a matter of law and the plaintiffs have not asserted a Fourteenth Amendment claim against Young. It is the plaintiffs' surviving Rehabilitation Act claim that is novel and, thus, the rights asserted thereunder are not clearly established.

Thus, the Court concludes that Young is entitled to qualified immunity from suit on the plaintiffs' Rehabilitation Act claim asserted against her. Accordingly, Young's motion to dismiss Count VI of the plaintiffs' complaint must be granted.

### 7. *Plaintiffs' State Law Claims Against DYFS and Young*

■ The plaintiffs assert claims for "failure to investigate" and for common law negligence against DYFS and Young in Counts IX and X of the complaint. *See* Complaint at ¶¶ 198–207 and 209–20. The plaintiffs assert claims against DYFS and Young in Count VIII of their complaint under NJLAD. *See id.* at ¶¶ 184–96. In Count XI of their complaint, the plaintiffs assert a claim against DYFS for violating their right to privacy under the New Jersey Constitution. *See id.* at ¶¶ 222–31. All of the plaintiffs' claims asserted against the State Defendants under state law are legally deficient.

### a) *Plaintiffs' state law claims against DYFS.*

■ As discussed more fully above, under the Eleventh Amendment a State is not subject to suit in federal Court unless the State consents to suit, or unless Congress has expressly abrogated the immunity pursuant to its constitutional grant of authority under the Fourteenth Amendment. *See Edelman*, 415 U.S. at 673, 94 S.Ct. 1347. Even where the State has consented to suit in its own courts, such as in the New Jersey Tort Claims Act, in order to be subject to suit in federal court the State must unequivocally say so. *See Florida Dep't of Health v. Florida Nursing Home Ass'n*, 450 U.S. 147, 150, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981) (per curium). In other words, a State must consent to whether it is subject to suit as well as where it is subject to suit. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 and n. 9, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

The plaintiffs' opposition papers are silent on this glaring legal deficiency in their state law claims. The plaintiffs have not identified any provision of state law where New Jersey has expressly consented to suit in federal court under the LAD, the state common law or the New Jersey Constitution.

Thus, the Court concludes that the plaintiffs' state law causes of action are barred under the Eleventh Amendment. Accordingly, the State Defendants' motion to dismiss Counts VIII, IX, X and XI to the extent those counts assert claims against DYFS nor Young in her official capacity must be granted.

### b) *Plaintiffs' state law claims against Young.*

■ While the plaintiffs' state law claims asserted against DYFS and Young acting in her official capacity are barred,

the Eleventh Amendment does not bar suits against Young in her individual capacity under state law. Those claims, however, fail as a matter of law.

■ The New Jersey Legislature, in enacting the New Jersey Tort Claims Act, declared that it is "to be the public policy of this State that public entities shall only be liable for their negligence within the limitations of this act and in accordance with the fair and uniform principles established herein.[6] All of the provisions of this act should be construed with a view to carry out the above legislative declaration." N.J. Stat. Ann. § 59:1–2. A "public entity" includes the "State, and any county, municipality, district, public authority, public agency, and any other political subdivision or public body in the State." N.J. Stat. Ann. § 59:1–3. An "employee" includes an "officer, employee, or servant, whether or not compensated or part-time, who is authorized to perform any act or service." N.J. Stat. Ann. § 59:1–3. Furthermore, a "public employee" means an employee of a public entity. *See id.* The Act further provides that, "[e]xcept as otherwise provided by this act, a public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." N.J. Stat. Ann. § 59:2–1a. A public entity is liable for any injury that is proximately caused by an act or omission of a public employee within the scope of his employment "in the same manner and to the same extent as a private individual under like circumstances," but is not liable for an injury resulting from an act or omission of a public employee where the public employee is not liable. *See* N.J. Stat. Ann. § 59:2–2. Neither a public employee, nor a public entity, is liable for an injury that results from the exercise of discretion or judgment vested in the employee or entity. *See* N.J. Stat. Ann. §§ 59:2–3 59:3–2. Additionally, a public employee is not liable if he acts in good faith in the execution or enforcement of any law. *See* N.J. Stat. Ann. § 59:3–3. The Act further provides that it does not exonerate a public employee from liability if it is established that the employee was acting outside the scope of his or her employment, or the employee's conduct rose to the level of a crime, fraud, actual malice or willful misconduct. *See* N.J. Stat. Ann. at § 59:3–14a.

Turning first to the plaintiffs' claim for failure to investigate asserted in Count IX of the complaint, the plaintiffs argue that Young had "a statutory duty to investigate allegations of suspected child abuse or neglect and to determine whether a child has been abused or neglected," and further argue that Young breached that duty when she accused Jane Doe of being drug involved during her pregnancy. *See* Plaintiffs' Brief in Opposition to State Defendants' Motion to Dismiss at 29 (citing N.J. Stat. Ann. §§ 9:6–11 and 30:4C–11).

■ Neither of the statutes relied on by the plaintiffs, however, provide for a private right of action on the facts alleged in this action. New Jersey law provides that upon receipt of an allegation of child abuse or neglect, DYFS "shall immediately

---

6. A federal district court sitting in diversity or exercising supplemental jurisdiction over state law causes of action must apply the applicable substantive law of the State as interpreted by the State's highest court. *See Erie R.R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *New Castle County DE v. National Union Fire Ins. Co. of Pittsburgh, PA,* 243 F.3d 744, 749 (3d Cir. 2001) (citations omitted); *Paolella v. Browning–Ferris, Inc.,* 158 F.3d 183, 189 (3d Cir. 1998) (citations omitted). Thus, when interpreting the plaintiffs' state law claims the Court will apply New Jersey law as interpreted by the New Jersey Supreme Court.

take such action as shall be necessary to insure the safety of the child and to that end may request and shall receive appropriate assistance from local and State law enforcement officials." N.J. Stat. Ann. § 9:6–8.11. While it appears that under New Jersey law an accused child abuser has a right to a hearing prior to being placed on a DYFS registry of abusers, *see In re Allegations of Sexual Abuse at East Park High Sch.*, 314 N.J.Super. 149, 714 A.2d 339, 349 (1998), there is nothing in the statute indicating that an accused abuser can maintain a private right of action against DYFS or its employees for failing to conduct a thorough investigation and, here, that is all that the plaintiffs allege. The plaintiffs allege that DYFS and Young failed to perform a confirmatory test on Baby Doe after Baby Doe's initial meconium test was positive for opiates, *see* Complaint at ¶¶ 202–03, and that DYFS and Young further failed to investigate the efficacy of the AZT protocol prescribed by the plaintiffs' doctors prior to mandating the treatment, *see id.* at ¶ 204. Assuming for purposes of this motion that the defendants did not perform a thorough investigation, there is no indication that New Jersey law provides a common law or statutory right of action for such a failure. The plaintiffs have failed to cite a single reported decision recognizing a cause of action for failure to investigate under New Jersey law, and the Court's own research has uncovered no such cause of action.

██ Moreover, even if New Jersey courts recognized a cause of action for failure to investigate, which they have not, the plaintiffs' claims against Young would be barred under the New Jersey Tort Claims Act. The act provides that "[a] public entity is not liable for any injury caused ... by failing to enforce any law." N.J. Stat. Ann. § 59:2–4. In Count IX of the complaint, the plaintiffs are attempting to do nothing more than impose liability on the State Defendants for allegedly failing to enforce state law requiring an investigation of abuse and neglect complaints. Moreover, the plaintiffs have failed to allege that Young did anything other than perform discretionary duties in her capacity as a DYFS case worker. Thus, the plaintiffs' claims are barred under the New Jersey Tort Claims Act. *See* N.J. Stat. Ann. §§ 59:2–3 59:3–2

Thus, the Court concludes that Young is not liable, as a matter of law, for her alleged failure to investigate. Accordingly, the defendants' motion to dismiss Count IX of the plaintiffs' complaint must be granted.

With respect to the plaintiffs' negligence claims asserted in Count X of the plaintiffs' complaint, the plaintiffs appear to have abandoned those claims. The defendants argue in their moving brief that, under the New Jersey Tort Claims Act, DYFS can only be held liable for the negligence of its employees to the same extent that the employee is liable under State law, and that Young is immune from suit on a claim of negligence under New Jersey law. *See* State Defendants Brief in Support of Motion to Dismiss at 34. The plaintiffs' argue in opposition that Count X of their complaint, notwithstanding its title "Negligence," "implicates more than negligence" and in reality is a claim for "willful misconduct" against Young. *See* Plaintiffs' Opposition Brief at 30.

The Court concludes, and the plaintiffs do not dispute, that both DYFS and Young are immune from suit for negligence under N.J. Stat. Ann. § 59:3–3 (providing that state employee is "not liable if he acts in good faith in the execution or enforcement of any law") and *B.F. v. Division of Youth and Family Srvs.*, 296 N.J.Super. 372, 686 A.2d 1249, 1257 (1997) (holding that DYFS and its employees are immune from suit

under the New Jersey Tort Claims Act for claims of negligence brought plaintiff wrongly accused of abuse and neglect). Rather, relying on N.J. Stat. Ann. § 59:3–14a the plaintiffs argue that their claim against Young is for "willful misconduct."

The New Jersey Tort Claims Act provides that "[n]othing in this act shall exonerate a public employee from liability if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful misconduct." N.J. Stat. Ann. § 59:3–14a. However, the terms "actual malice" and "willful misconduct" as used in the act appear to refer to the requisite state of mind of an employee acting outside the scope of her employment. If the employee commits some underlying tort, such as assault, with scienter and is acting outside the scope of her employment, that employee is not entitled to the immunities provided in the Tort Claims Act. The plaintiffs have not cited and the Court's own research has not uncovered a single case under the New Jersey law recognizing a tort of "willful misconduct" against a state officer.

Thus, the Court concludes that the plaintiffs' negligence claims asserted in Count X of the complaint, which now are re-framed as claims for "willful misconduct," are legally deficient. Accordingly, the defendants' motion to dismiss Count X of the plaintiffs' complaint must be granted for failure to state a claim upon which relief can be granted.

■■■ Finally, The plaintiffs assert a claim against Young in Count VIII of their complaint under NJLAD. *See* Complaint at ¶¶ 184–96.[7] The State Defendants argue that they are not liable under NJLAD,

as a matter of law, because DYFS is not a place of public accommodation as defined in the statute. The plaintiffs, without citing a single case interpreting New Jersey law, argue that a state agency like DYFS is a place of public accommodation under NJLAD.

The New Jersey Law Against Discrimination provides, in pertinent part, that it shall be considered an unlawful act of discrimination "[f]or any owner, lessee, proprietor, manager, superintendent, agent, or employee of any place of public accommodation directly or indirectly to refuse, withhold from or deny to any person any of the accommodations, advantages, facilities or privileges thereof...." N.J. Stat. Ann. § 10:5–12(f)(1). A place of public accommodation, in turn,

shall include, but not be limited to: any tavern, roadhouse, hotel, motel, trailer camp, summer camp, day camp, or resort camp, whether for entertainment of transient guests or accommodation of those seeking health, recreation or rest; any producer, manufacturer, wholesaler, distributor, retail shop, store, establishment, or concession dealing with goods or services of any kind; any restaurant, eating house, or place where food is sold for consumption on the premises; any place maintained for the sale of ice cream, ice and fruit preparations or their derivatives, soda water or confections, or where any beverages of any kind are retailed for consumption on the premises; any garage, any public conveyance operated on land or water, or in the air, any stations and terminals thereof; any bathhouse, boardwalk, or seashore accommodation; any auditorium, meeting place, or hall; any theater, motion-picture house, music hall, roof

---

**7.** Count VIII is identified in the complaint with the numeral XIII, which appears to be a typographical error.

garden, skating rink, swimming pool, amusement and recreation park, fair, bowling alley, gymnasium, shooting gallery, billiard and pool parlor, or other place of amusement; any comfort station; any dispensary, clinic or hospital; any public library; any kindergarten, primary and secondary school, trade or business school, high school, academy, college and university, or any educational institution under the supervision of the State Board of Education, or the Commissioner of Education of the State of New Jersey.

N.J. Stat. Ann. § 10:5–5(*l*).

Neither the State of New Jersey nor its agencies are listed entities in NJLAD. While the list of places of public accommodation in the statute is not intended to be exhaustive, the list has been used by New Jersey courts as "a benchmark for determining whether the unlisted entity should be included." *See Dale v. Boy Scouts of America,* 160 N.J. 562, 734 A.2d 1196, 1213 (1999) (citing *Board of Chosen Freeholders v. State,* 159 N.J. 565, 732 A.2d 1053 (1999)), *rev'd on other grounds,* 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000). A brief review of the listed entities leads to the inescapable conclusion that none of the listed entities even remotely resemble DYFS or any other State agency. The list includes taverns, hotels, summer camps, retail shops, restaurants, garages, bathhouses, music halls, pool halls, libraries and schools. *See* N.J. Stat. Ann. § 10:5–5(*l*). Certainly, had the legislature intended to include State agencies within NJLAD's public accommodation provision, it would have included at least one term reflecting that intent.

Moreover, even applying the tests employed by New Jersey courts to determine whether an unlisted entity is considered a place of public accommodation under NJLAD, DYFS does not fall within the statutory definition. One key factor courts have looked to is whether the entity engages in "broad solicitation" in an effort to attract the public to its organization. *See Dale,* 734 A.2d at 1210; *National Org. for Women v. Little League Baseball, Inc.,* 127 N.J.Super. 522, 318 A.2d 33, 37–38 (1974), *aff'd,* 67 N.J. 320, 338 A.2d 198 (1974). It cannot be said that a State child welfare agency charged with enforcing anti-child abuse laws broadly solicits the public to partake in its services.

Thus, the Court concludes that DYFS is not place of public accommodation under NJLAD and, therefore, Young is not an employee of a place of public accommodation liable under the act. Accordingly, the defendants' motion to dismiss Count VIII of the plaintiffs' complaint must be granted.

In summary, the State Defendants' motion to dismiss Counts V, VII, VIII, IX, X and XI is granted. The State Defendants' motion to dismiss Count VI is granted with respect to defendant Young only. All of plaintiffs' claims asserted against defendants Young, Chichester, McHale Weinberg and St. John are dismissed. The plaintiffs' only remaining claims against the State Defendants are the Rehabilitation Act claim asserted against DYFS in Count VI.

### C. Motions of Defendants Capital Health Systems, Potako, Dix, Bennett and Cahill for Judgment on the Pleadings

Capital Health Systems, Potako, Dix, Bennett and Cahill move for judgment on the pleadings on the plaintiffs claims under the ADA, NJLAD, NJAAA and for common law "tortious interference with parental rights."

### 1. Rule 12(c) Standard Governing Judgment on the Pleadings

A defendant may move to dismiss a complaint or parts of a complaint before or after filing an answer. *See* Fed.R.Civ.P. 12(b)(6) and (c). A motion made before an answer is filed is a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). A motion made after an answer is filed is a motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c).[8] "A defense of failure to state a claim upon which relief can be granted ... may be made in ... [a] motion for judgment on the pleadings." *See* Fed.R.Civ.P. 12(h)(2). Here, the motion was filed after the answer.

 The standard under which the Court must analyze the plaintiff's complaint and the defendants' arguments in a Rule 12(c) motion for judgment on the pleadings is the same as the standard in a motion to dismiss under Fed.R.Civ.P. 12(b)(6). *See* Fed.R.Civ.P. 12(h)(2); *see also Turbe v. Government of the Virgin Islands,* 938 F.2d 427, 428 (3d Cir.1991); *Institute for Scientific Info., Inc. v. Gordon & Breach, Science Publishers, Inc.,* 931 F.2d 1002, 1006 (3d Cir.), *cert. denied,* 502 U.S. 909, 112 S.Ct. 302, 116 L.Ed.2d 245 (1991).

 Like Rule 12(b)(6), Rule 12(c) requires the Court "accept the allegations in the complaint as true, and draw all reasonable factual inferences in favor of the plaintiff. [The motion can be granted] only if no relief could be granted under any set of facts that could be proved." *Turbe,* 938 F.2d at 428 (citing *Unger v.*

*National Residents Matching Program,* 928 F.2d 1392, 1394–95 (3d Cir.1991)); *see also Dykes v. Southeastern Pennsylvania Transp. Auth.,* 68 F.3d 1564, 1565, n. 1 (3d Cir.1995); *Piecknick v. Commonwealth of Pennsylvania,* 36 F.3d 1250, 1255 (3d Cir. 1994); *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir. 1994). A complaint may be dismissed for failure to state a claim where it appears beyond any doubt that no relief could be granted under any set of facts which could be proved consistent with the allegations. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

A complaint should not be dismissed unless it appears beyond doubt that "the facts alleged in the complaint, even if true, fail to support the claim." *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988). Legal conclusions made in the guise of factual allegations, however, are given no presumption of truthfulness. *See Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *see also Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997) ( "[A] court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss").

 A district court reviewing the sufficiency of a complaint has a limited role. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support his [or her] claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40

---

8. Rule 12(c) provides:
 "Motion for Judgment on the Pleadings. After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the

motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all materials made pertinent to such a motion by Rule 56."
 Fed.R.Civ.P. 12(c).

L.Ed.2d 90 (1974). Generally, when conducting such an inquiry, material beyond the pleadings should not be considered. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997); *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir.), *cert. denied*, 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994); *Gannon v. Continental Ins. Co.*, 920 F.Supp. 566, 574 (D.N.J.1996). When a court relies upon matters outside of the pleadings, it must convert the motion to dismiss into a motion for summary judgment pursuant to Fed. R.Civ.P. 56. *See* Fed.R.Civ.P. 12(c); *Zucker v. Quasha*, 891 F.Supp. 1010, 1013 (D.N.J.1995), *aff'd*, 82 F.3d 408 (3d Cir.), *cert. denied*, 519 U.S. 825, 117 S.Ct. 85, 136 L.Ed.2d 42 (1996). An exception to this rule is when the Court relies upon documents to which the plaintiff refers in the complaint. *See Zucker*, 891 F.Supp. at 1013 (citing *Pension Benefit Guaranty Corp. v. White Consolidated Industries, Inc.*, 998 F.2d 1192, 1196–97 (3d Cir.1993)).

### 2. *The Plaintiffs' Claims Against Cahill*

Before turning to the merits of the Capital Health Defendants' motion for judgment on the pleadings, the Court must address a more glaring deficiency in the plaintiffs' claims asserted against Cahill. The plaintiffs allege that defendant Cahill is a "nurse/midwife" employed by Capital Health Systems, that Cahill refused Jane Doe's request for a second HIV test, and that Cahill prescribed AZT for Jane Doe. *See* Complaint at ¶¶ 17, 38 and 39. As with defendants Chichester, McHale, Weinberg and St. John discussed in Part II.B.2., *supra*, the plaintiffs do not assert any particular cause of action against Cahill. Although the defendants raise this point in their motion for judgment on the pleadings, the plaintiffs' brief in opposition is silent with respect to Cahill and the plaintiffs appear to have abandoned any claims against her.

Thus, the Court concludes that the plaintiffs' complaint fails to state a claim upon which relief can be granted against Cahill. Accordingly, Cahill's motion for judgment on the pleadings must be granted.

### 3. *Plaintiffs' ADA Claim*

The plaintiffs assert claims against defendants Capital Health, Potako and others in Count I of the complaint. *See* Complaint at ¶¶ 99–111. The moving defendants argue that the plaintiffs' claims asserted in Count I under the ADA fail as a matter of law because the defendants did not deny the plaintiffs any services provided at the hospital and at all times acted in the best interests of Baby Doe. The plaintiffs counter that the complaint asserts a claim under the ADA based on the disparate treatment Jane Doe received based on her HIV status. The defendants also argue, relying on cases interpreting Title II of the ADA, that the plaintiffs' ADA claim asserted against Potako must be dismissed because Title III of the ADA does not provide for individual liability. The plaintiffs argue in opposition that Title III, unlike Title II, of the ADA, expressly provides for individual liability.

#### a) *Plaintiffs' ADA claim against Capital Health.*

Title III of the ADA proscribes a broad range of discrimination against the disabled in places of public accommodation. *See PGA Tour, Inc. v. Martin*, 531 U.S. 1049, 121 S.Ct. 1879, 1889, 149 L.Ed.2d 904 (2001). The act provides, in pertinent part:

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods,

services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation. 42 U.S.C. § 12182(a). It is a discriminatory act under Title III to

afford an individual . . ., on the basis of a disability or disabilities of such individual . . ., directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals.

42 U.S.C. § 12182(b)(1)(A)(ii).

Here, the plaintiffs allege, and the defendants do not dispute, that Jane Doe is an individual with a disability as defined in the ADA. *See Bragdon v. Abbott,* 524 U.S. 624, 655, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (holding that individual infected with HIV is disabled individual under the ADA); *D.B. v. Bloom,* 896 F.Supp. 166, 170 (D.N.J.1995) (same). Rather, the defendants argue that the plaintiffs were not denied any services at Capital Health. The defendants' argument is without merit because the ADA proscribes not only denial of services based on a disability, *see* 42 U.S.C. § 12182(b)(1)(A)(1), but also proscribes the denial of an opportunity to participate in services on an equal basis with nondisabled individuals, *see* 42 U.S.C. § 12182(b)(1)(A)(ii). The plaintiffs allege that Capital Health personnel disclosed Jane Doe's HIV status to DYFS and the plaintiffs' family members, that Capital Health personnel refused to re-test Jane Doe for HIV, that Capital Health personnel refused to administer to Jane Doe oral pain medication during delivery, that Capital Health personnel summoned the Trenton police and disclosed to the responding officers that Jane Doe was HIV positive,

and that all of these actions were taken based on Jane Doe's HIV status.

Thus, the Court concludes that the plaintiffs have stated a cause of action under Title III of the ADA. Accordingly, Capital Health's motion for judgment on the pleadings on the plaintiffs' ADA claim asserted in Count I of the complaint must be denied.

b) *Plaintiffs' ADA claim against Potako.*

■■■ The defendants also argue, relying on cases interpreting Title II of the ADA, that the plaintiffs' ADA claim asserted against Potako must be dismissed as a matter of law because the ADA does not provide for the imposition of individual liability.

■■■ Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Courts interpreting Title II have held that this section of the ADA does not provide for imposition of liability on individuals but, rather, on "public entities" only. *See Calloway v. Boro of Glassboro Dep't of Police,* 89 F.Supp.2d 543, 557 (D.N.J.2000) (collecting cases). The plaintiffs point out in their brief in opposition to the defendants' motion that their claims against Potako are asserted under Title III, not Title II of the ADA. The defendants did not file a reply brief responding to this argument.

Title III of the ADA, provides

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of

public accommodation *by any person who owns, leases (or leases to), or operates* a place of public accommodation. 42 U.S.C. § 12182(a) (emphasis supplied). The plaintiffs argue that the inclusion of the word "person" in Title III reflects Congress's intent to impose liability on individuals for violation of the act. The plaintiffs' argument, however, ignores the language appearing in the statute after the word "person." Title III applies to any person "who owns, leases (or leases to), or operates a place of public accommodation." *Id.* Thus, in order to hold nurse Potako liable under Title III, the Court must determine whether the plaintiffs have alleged that Potako was either an owner, lessor, lessee or operator of Capital Health Systems. *See Coddington v. Adelphi Univ.,* 45 F.Supp.2d 211, 215–18 (E.D.N.Y.1999) (holding that individual university employees are not liable under Title III of the ADA); *Atakpa v. Perimeter OB–GYN Assocs., P.C.,* 912 F.Supp. 1566, 1574 n. 5 (N.D.Ga.1994) (holding that individual nurse employed by hospital is not liable under Title III of the ADA because she is not an owner or operator of the hospital); *Howe v. Hull, M.D.,* 874 F.Supp. 779, 788(N.D.Ohio 1994) (denying individual's motion for summary judgment because there was a dispute as to whether hospital's Vice Chief of Staff was an "operator" of defendant hospital).

Here, the plaintiffs allege only that Potako was a "nurse employed by Defendant Capital Health." Complaint at ¶ 14. There is no allegation anywhere in the record before the Court that Potako was anything other than an employee of Capital Health Systems.

Thus, the Court concludes that the plaintiffs' ADA claim asserted against Potako fails as a matter of law because the plaintiffs have failed to allege that nurse Potako was an owner or operator of Capi-

tal Health Systems. Accordingly, defendant Potako's motion for judgment on the pleadings on the plaintiffs' ADA claim asserted in Count I of the complaint must be granted.

### 4. *Plaintiffs' NJLAD Claims*

■ The plaintiffs assert claims against Capital Health Systems and Potako, as well as Loeb, in Count II of the complaint under NJLAD. *See* Complaint at ¶¶ 113–24. The moving defendants assert the same argument with respect to the plaintiffs' NJLAD claims as they asserted on the ADA claim—that the defendants did not deny the plaintiffs any services and that they acted at all times in the best interest of Baby Doe.

■ The New Jersey Law Against Discrimination prohibits discrimination on the basis of a handicap by places of public accommodation and their owners, employees and agents. *See* N.J. Stat. Ann. §§ 10:5–4.1 and 10:5–12. The statute provides that "[a]ll persons shall have the opportunity to obtain ... all the accommodations, advantages, facilities, and privileges if any place of public accommodation ... without discrimination." N.J. Stat. Ann. § 10:5–4.

The plaintiffs allege, and the defendants do not dispute, that Jane Doe, by virtue of her HIV status, is handicapped, *see D.B. v. Bloom,* 896 F.Supp. 166, 171 (D.N.J.1995), that Capital Health Systems is a place of public accommodation, *see* N.J. Stat. Ann. § 10:5–5(*l*), and that Potako is an employee of Capital Health Systems. Rather, the moving defendants argue that the plaintiffs have not alleged that they were denied services.

For the reasons discussed in Part II.C.3, *supra,* the defendants' argument is without merit. The plaintiffs allege that Capital Health personnel disclosed Jane Doe's

HIV status to DYFS and the plaintiffs' family members, that Capital Health personnel refused to re-test Jane Doe for HIV, that Capital Health personnel refused to administer to Jane Doe oral pain medication during delivery, that Capital Health personnel summoned the Trenton police and disclosed to the responding officers that Jane Doe was HIV positive, and that all of these actions were taken based on Jane Doe's HIV status. All of these allegations, if proven true, could support a claim against the Capital Health Defendants under NJLAD.

Thus, the Court concludes that the plaintiffs have stated a claim upon which relief can be granted under NJLAD against Capital health Systems and Potako in Count II of the complaint.[9]

### 5. *Plaintiffs' NJAAA Claims*

■ The plaintiffs assert claims against Capital Health Systems, Potako, Dix and Bennett, as well as Loeb and Moffitt, under NJAAA in Count III of their complaint alleging that the defendants tested the plaintiff for HIV and then disclosed her HIV status to others without written consent. The moving defendants argue that the plaintiffs' claims fail because they did have Jane Doe's written consent to test her blood, and that they contacted DYFS and disclosed Jane Doe's HIV status because they were concerned with the health and safety of Baby Doe. The defendants' argument is without merit.

The New Jersey Aids Assistance Act provides that any record identifying a person who has or is suspected of having AIDS or HIV is confidential and can be disclosed only to the extent authorized un-der the act. *See* N.J. Stat. Ann. § 26:5C-7. The act authorizes disclosure only with prior written informed consent of the person who is the subject of the record, *see* N.J. Stat. Ann. § 26:5C-8a, or to the extent authorized by law, *see* N.J. Stat. Ann. § 26:5C-8b(6), or in other limited and tightly restricted circumstances not relevant here. The act further provides for a private right of action against any individual or entity that violates the act. *See* N.J. Stat. Ann. §§ 26:5C-14a and 26:5C-18. With respect to pregnant women, the act provides that healthcare providers shall provide HIV counseling and information to all pregnant women, and advise the women of the option of being tested upon written consent. *See* N.J. Stat. Ann. § 26:5C-16(a).

The plaintiffs allege in their complaint that Jane Doe initially signed a written consent to be tested for HIV and later withdrew that consent, and that notwithstanding her withdrawal of consent, her blood was tested for HIV. *See* Complaint at ¶¶ 21, 24 and 35. The plaintiffs further allege that Capital Health personnel contacted DYFS in or about July and October 1998 and informed DYFS that Jane Doe had tested positive for HIV. *See id.* at ¶ 42. Finally, the plaintiffs allege that defendants Loeb and Moffitt, who the plaintiffs allege were doctors employed by Capital Health.Systems acting within the scope of their employment, disclosed Jane Doe's HIV status to family members without her written consent. *See id.* at ¶¶ 48 and 57.

The defendants, relying on documents attached to their moving brief, counter that Jane Doe gave her informed consent to be tested and was provided counseling. Because the defendants' argument relies

---

9. The New Jersey Law Against Discrimination, unlike Title III of the ADA, expressly provides for the imposition of liability on "employees" of places of public accommoda-tion who violate the act. *See* N.J. Stat. Ann. § 10:5-12(f). Thus, there is no question as to whether Potako can be held individually liable under NJLAD as a matter of law.

on facts outside of the pleadings, the defendants' motion must be denied on a motion for judgment on the pleadings. See Fed.R.Civ.P. 12(c). Moreover, even if the Court were to consider facts outside of the pleadings, which it declines to do, and treat the defendants' motion as one for summary judgment under Fed.R.Civ.P. 56, the defendants' motion must nevertheless be denied because the defendants raise quintessential factual disputes with respect to whether Jane Doe withdrew her consent to be tested for HIV and whether she received counseling to the extent required under the act. Moreover, the defendants' argument that they disclosed Jane Doe's HIV status to DYFS along with the fact that Baby Doe tested positive for opiates because of their concern for Baby Doe also is not relevant to the issues raised in this motion.

Thus, the Court concludes that the plaintiffs have stated a claim under the NJAAA in Count III of their complaint against Capital Health Systems, Potako, Dix and Bennett. Accordingly, the defendants' motion to dismiss Count III of the complaint must be denied.

### 6. Plaintiffs' Claim for Tortious Interference with Parental Rights

■ The plaintiffs assert a common law claim for tortious interference with parental rights against Capital Health Systems, Potako and Dix in Count IV of the complaint. See Complaint at ¶¶ 138–43. The defendants argue that the plaintiffs' claim fails as a matter of law because no New Jersey court has recognized a cause of action for tortious interference with parental rights. The plaintiffs' opposition urges the Court to adopt such a tort, claiming that there is nothing in New Jersey law indicating that New Jersey courts would not recognize such a claim. The plaintiffs' argument is without merit and

misconstrues the role of a federal district court when interpreting state law.

■ A federal district court sitting in diversity or exercising supplemental jurisdiction over state law causes of action must apply the applicable substantive law of the State as interpreted by the State's highest court. See Erie R.R. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); New Castle County DE v. National Union Fire Ins. Co. of Pittsburgh, PA, 243 F.3d 744, 749 (3d Cir.2001) (citations omitted); Paolella v. Browning–Ferris, Inc., 158 F.3d 183, 189 (3d Cir.1998) (citations omitted). Where the State's highest court has not spoken on an issue, the role of the district court is to predict how that court would rule if the issue were presented to it. See New Castle County, 243 F.3d at 749 (citations omitted); Chemical Leaman Tank Lines, Inc. v. Aetna Casualty and Surety Co., 177 F.3d 210, 227–28 (3d Cir.1999); Paolella, 158 F.3d at 189 (citations omitted). When predicting how a State's highest court might rule on an unresolved question, the Court is not bound by, but may find persuasive, decisions by intermediate appellate courts of the State. See Naporano Iron & Metal Co. v. American Crane Corp., 79 F.Supp.2d 494, 502 (D.N.J.1999) (citations omitted).

Here, the plaintiffs have provided little support for their argument that the New Jersey Supreme Court, if presented with the issue, would adopt a tort of tortious interference with parental rights. The plaintiffs merely cite three reported decisions from other jurisdictions and one treatise recognizing the tort. However, the plaintiffs have not cited, and the Court's own research has not uncovered, a single reported decision interpreting New Jersey law recognizing the cause of action.

Thus, the Court declines the plaintiffs' invitation to predict that the New Jersey

Supreme Court would adopt a cause of action for tortious interference with parental rights, and concludes that the plaintiffs have failed to state a claim under New Jersey law upon which relief can be granted. Accordingly, the defendants' motion to dismiss Count IV of the plaintiffs' complaint must be granted.

In summary, the Capital Health Defendants' motion for judgment on the pleadings with respect to the plaintiffs' claims against defendant Cahill is granted in its entirety. The defendants' motion with respect to Count I is granted only as to defendant Potako, and denied in all other respects. The defendants' motion with respect to the claims asserted in Counts II and III is denied. The defendants' motion with respect to the plaintiffs' claim asserted in Count IV is granted. The plaintiffs' remaining claims against the Capital Health defendants are their ADA claim against Capital Health Systems; their NJLAD claim against Capital Health Systems and Potako; and their NJAAA claim against Capital Health Systems, Potako, Dix and Bennett.

### D. MOTION OF DEFENDANT STEPHEN MOFFITT, M.D. TO DISMISS

■ The plaintiffs assert a claim against Moffitt in Count III under the NJAAA only. *See* Complaint at ¶¶ 126–36. Moffitt makes four largely irrelevant arguments in support of his motion.

First, Moffitt argues that, while the plaintiffs allege in their complaint that Moffitt disclosed to the plaintiffs' family members that she was HIV positive, they fail to allege that the family members actually heard the disclosure. This argument is refuted merely by stating it. Whether or not the family members actually heard Moffitt's disclosures will be ascertained through the discovery process and, if necessary, at trial, and is inappropriately raised in a motion to dismiss.

Second, Moffitt argues that the complaint fails to allege whether the family members were authorized to hear the disclosures. The relevance of this argument is unclear given the standards under the NJAAA discussed in Part II.C.5, *supra.* There is no language in the NJAAA that would permit the disclosure of confidential information to family members absent written consent or to the extent authorized by law. *See* N.J. Stat. Ann. §§ 26:5C–8a and 8b. Moffitt has cited no law authorizing the disclosure of confidential information to family members.

Third, Moffitt argues that any communications that he had with doctors, nurses, and Jane Doe with respect to her HIV status was privileged as the communication was necessary for her care. Even assuming the truth of Moffitt's assertion, again the argument is irrelevant here because the plaintiffs allege that the prohibited disclosures were made to Jane Doe's family members, who prior to the disclosures were unaware of her HIV status, and not hospital personnel. There is no mention anywhere in the complaint about disclosures made to hospital staff.

Finally, Moffitt argues that because the sole claim asserted against him arises under state rather than federal law, the Court is without jurisdiction over him. Moffitt's argument seems to confuse the unrelated concepts of subject matter jurisdiction and personal jurisdiction and has no merit. Clearly, the Court has subject matter jurisdiction over the plaintiffs' state claims asserted against Moffitt pursuant to 28 U.S.C. § 1367(a) as those claims arise from and are interrelated with the remaining federal claims asserted against the other defendants.

Thus, the Court concludes that the plaintiffs have stated a claim against Mof-

fitt under the NJAAA, and further concludes that the Court has subject matter jurisdiction over that claim. Accordingly, Moffitt's motion to dismiss Count III of the plaintiffs' complaint must be denied.

## III. CONCLUSION

For the reasons discussed, above the State Defendants' motion to dismiss the plaintiffs' complaint is granted in part and denied in part, the Capital Health Defendants' motion for judgment on the pleadings is granted in part and denied in part, Moffitt's motion to dismiss the complaint is denied, and the plaintiffs' motion for leave to file an amended complaint is denied. An appropriate form of order is filed herewith.

## ORDER

This matter having come before the Court upon motion to dismiss of the defendants Division of Youth and Family Services, Andrea Young, Cathee Chichester, Peggy McHale, Keith Weinberg and Mary Ann St. John (collectively, the "State Defendants"); upon the motion for judgment on the pleadings of the defendants Capital Health System, Inc., Evelyn Potako, Joanne Dix, Betty Bennett and Marietta Cahill (collectively the "Capital Health Defendants"); upon the motion to dismiss of the defendant Stephen Moffitt, M.D.; and upon the motion of the plaintiffs for leave to file an amended complaint; and the Court having considered the parties' submissions without oral arguments pursuant to Fed.R.Civ.P. 78; and for the reasons stated in the Opinion filed herewith;

IT IS this 25th day of June, 2001 hereby;

ORDERED that the motion of the State Defendants to dismiss is GRANTED IN PART AND DENIED IN PART; and it is further

ORDERED that the motion for judgment on the pleadings of the Capital Health Defendants is GRANTED IN PART AND DENIED IN PART; and it is further

ORDERED that the motion to dismiss of the defendant Stephen Moffitt is DENIED; and it is further

ORDERED that the plaintiffs' motion for leave to file an amend complaint is DENIED; and it is further

ORDERED that all claims asserted against Cahill, Young, Chichester, McHale, Weinberg and St. John are DISMISSED in their entirety and that those defendants are terminated.